## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KRISTINE L. HAMILTON,          ]
                                ]
                Plaintiff,    ]
vs.                           ]       Civil Action No._____
                                ]
LIVANOVA DEUTSCHLAND GMBH (f/k/a  ]     COMPLAINT
SORIN GROUP DEUTSCHLAND GMBH) and  ]    JURY TRIAL DEMANDED
SORIN GROUP USA, INC.,        ]
                                ]
                Defendants.  ]
                                ]

## COMPLAINT

Plaintiff, Kristine L. Hamilton, by way of Complaint against Defendants, LivaNova

Deutschland GmbH and Sorin Group USA, Inc., alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to the diverse

citizenship of the parties, 28 U.S.C. Sec. 1332(a)(2).  Plaintiff is a citizen and resident of the

State of Kansas.  Defendant, LivaNova Deutschland GmbH, is a foreign corporation

headquartered in Munich, Germany.  Defendant, Sorin Group USA, Inc., has a principal place of

business in Arvada, Colorado, and is incorporated in the State of Delaware.

2.      Personal jurisdiction exists over Defendants, LivaNova Deutschland GmbH and

Sorin Group USA, Inc., in the U.S. and in Kansas due to the general and specific contacts they

maintain.  Defendants maintain those contacts presently and did so at all times material to this

action.  The amount in controversy exceeds $75,000.00.

3.      Venue is proper in this District pursuant to 28 U.S.C. Sec. 1391, as a substantial

1

part of the events and/or omissions giving rise to the Plaintiff's claims emanated from activities within the jurisdiction, and Defendants conduct substantial business within this jurisdiction.

## THE PARTIES

4.      Plaintiff Kristine L. Hamilton is an adult individual and citizen of the State of Kansas, residing in Butler County, Kansas.

5.      Defendant, LivaNova Deutschland GmbH (formerly known as Sorin Group Deutschland GmbH) ("Sorin") is a foreign for-profit corporation headquartered in Munich, Germany. Sorin designed, manufactured and marketed the Sorin 3T Heater-Cooler System.

6.      Defendant, Sorin Group USA, Inc. ("Sorin USA") is a U.S. designer, manufacturer, marketer and distributor of the Sorin 3T Heater-Cooler System, with a principal place of business in Arvada, Colorado.

## GENERAL FACTUAL ALLEGATIONS

7.      The bacterium at issue, *Mycobacterium Chimaera,* is a subspecies of Nontuberculous Mycobacterium ("NTM") that occurs naturally in the environment and rarely causes illness. However, *M. Chimaera* poses a unique risk to patients whose organs and chest cavities are directly exposed to the bacteria during surgery.

8.      Because *M. Chimaera* is a slow growing bacterium, it generally takes anywhere from several months to six years before manifestation of an *M. Chimaera* infection, which most commonly results in a heart infection known as endocarditis or disseminated infection spread throughout the body.

9.      Symptoms of *M. Chimaera* infection are non-specific and may include any of the

following: persistent fever, night sweats, joint and muscle pain, unexplained weight loss and fatigue.

10.     The diagnosis of an *M. Chimaera* infection requires targeted culturing and/or molecular diagnostic testing, the results of which take at least six to eight weeks.

11.     The Sorin 3T Heater-Cooler Systems ("3T") used at The University of Kansas Hospital in 2016 were designed, manufactured, marketed and/or sold by Defendants, Sorin and Sorin USA.

12.     The 3T regulates blood temperature by circulating water through tubes into a heat exchanger where blood is pumped into separate chambers during surgery.  The water tanks and other areas where water pass through aerosolize a vapor containing NTM which exits out of the device and is pushed into the ambient air of the operating room through the System's exhaust fan.  If placed in the operating room, the contaminated vapor from the 3T directly enters the sterile surgical field and the patient's open body.

13.     Published articles dating back to the 1980s confirm that NTM is commonly found in water and has a high propensity to become airborne (aerosolize) through natural processes.[1]

14.     The potential for contaminated water from heater-cooler devices to infect patients intra-operatively was recognized by the medical and scientific community as early as November

---

[1] *See eg.*, Wendt, *et al.*, Epidemiology of Infection by Nontuberculous Mycobacteria, III. Isolation of Potentially Pathogenic Mycobacteria from Aerosols, American Review of Respiratory Disease, 1980 ("Field experiments have confirmed the existence of a natural mechanism for the transfer of significant numbers of mycobacteria from water to air."); Falkinham, Mycobacterial Aerosols and Respiratory Disease, Emerging Infectious Diseases, July 2003 ("Environmental opportunistic Mycobacteria are present in drinking water, resistant to disinfection, able to provoke inflammatory reactions, and readily aerosolized.")

2002.[2]

15.     Invasive cardiovascular infections identified as NTM have been reported in Switzerland, Germany and the Netherlands since 2011.[3]

16.     A public health investigation in Switzerland following six patient infections since 2011 included microbiological examinations of environmental samples that identified *M. Chimaera* contamination in heater-cooler units, including water samples from inside the units. Samples of the ambient air were positive for *M. Chimaera* when the units were running, but negative when they were turned off.[4]

17.     In April 2011, the United States Food and Drug Administration ("FDA") visited Defendant Sorin, in Munich, Germany, for a plant inspection and to discuss safety concerns with several products, including the 3T approved in 2005 through the 510(k) process.  The FDA advised the company that its 3Ts harbored dangerous bacteria and that it had failed to make a proper risk assessment for cleaning the devices to avoid bacterial infections in patients exposed

——————————————

[2]*See* The Heater-Cooler Unit–A Conceivable Source of Infection, Weitkemper, *et al.*, The Journal of the American Society of Extra-Corporeal Technology, 2002.

[3]ECDC Rapid Risk Assessment, Invasive Cardiovascular Infection by Mycobacterium Chimaera Potentially Associated with Heater-Cooler Units Used During Cardiac Surgery, April 30, 2015, available online at http://ecdc.europa.eu/en/publications/Publications/mycobacterium-chimaera-infection-associated-with-heater-cooler-units-rapid-risk-assessment-30-April-2015.pdf (last accessed August 21, 2017).

[4]Subsequent studies have further confirmed that the 3T aerosolizes *M. Chimaera* when powered on. *See e.g.*, Lyman, *et al.* Invasive Nontuberculous Mycobacterial Infections Among Cardiothoracic Surgical Patients Exposed to Heater-Cooler Devices, Emerging Infectious Diseases, May 2017; Gotting, *et al.*, Heater-Cooler Units: Contamination of Crucial Devices in Cardiothoracic Surgery, Journal of Hospital Infection, February 2016; Sommerstein, *et al.*, Transmission of *Mycobacterium Chimaera* from Heater-Cooler Units during Cardiac Surgery Despite an Ultraclean Air Ventilation System, Emerging Infectious Diseases, June 2016.

in the operating room.

18.     Defendants conceded to the FDA that this particular patient risk was "not considered" because it was "not of concern."

19.     During this inspection, the FDA advised the company that the bacterial growth charts it used to justify the original instruction for device disinfection every 14 days allowed bacterial overgrowth well in excess of safe standards in just one and a half days.  The company admitted to the FDA that its cleaning instructions did not meet these standards and that it had no information to support the cleaning methods it disseminated to U.S. purchasers.

20.     More than four years later, on July 15, 2015, Defendants issued a Class 2 Recall of the 3T's instructions for use ("IFU") because of "[p]otential colonization of organisms, including Mycobacteria, in Sorin Heater-Cooler Devices, if proper disinfection and maintenance is not performed per instructions for use."

21.     The recall directed customers to follow the new cleaning and disinfection procedures outlined in a Field Safety Notice issued by Defendants on June 15, 2015.

22.     According to this Field Safety Notice, the company's hygiene concept was "enhanced"[5] by introducing the following modifications:

        a)      Use filtered tap water when filling the device;

        b)      To make disinfection easier, switch from three different cleaning
                procedures (every five days, every two weeks and every three
                months), to just two (every seven days and every fourteen days);

---

[5]A month prior to the recall, in May 2015, Defendants informed customers that devices that had not been maintained according to the manufacturers' IFUs required a mechanical deep disinfection process to remove bacterial colonization, referred to as "biofilm".

c)       The option to use peracetic acid instead of Clorox for disinfection;

d)       Use hydrogen peroxide in low dose for device preservation;

e)       Include all external tubing, bottles and buckets in the disinfection

process;

f)       Change to polyethylene tubing that meets national drinking water

standards; and

g)       Unused heater-coolers should be disinfected bi-weekly.

23.      Upon information and belief, Defendants knew or should have known that design

and/or manufacturing defects in its 3T render it prone to bacterial colonization and transmission,

*regardless of the cleaning and disinfection procedures used.*[6]

24.      Manufacturing and User Facility Device Experience ("MAUDE") reports, such as

one reported to the FDA on July 7, 2016, evidence that even mechanical deep disinfection

followed by the use of filtered water, new water hoses, and three cycles of Defendants' new

cleaning procedures fail to eliminate high bacteria counts in the 3T.[7]

---

[6]*See e.g.*, Garvey *et al.*, Decontamination of Heater-Cooler Units Associated with
Contamination by Atypical Mycobacteria, Journal of Hosp. Infection, March 2016 (finding that
Defendants' decontamination protocol was inadequate and that removal of internal tubing was
required to achieve water quality in 3Ts); Marra, *et al.*, Mycobacterium Chimaera Infections
Associated with Contaminated Heater-Cooler Devices for Cardiac Surgery: Outbreak
Management, Clinical Infectious Diseases, April 19, 2017 ("Despite adherence to these
[manufacturer] recommendations for use of sterile or filtered water, and regular water circuit
disinfection and tubing changes, *M. Chimaera* contamination will persist...investigators using far
more intensive attempts at disinfection have been unable to eradicate *M. Chimaera* from 3T
HCDs.") (internal citations omitted).

[7]*See also*, ECDC Rapid Risk Assessment, *supra* ("In Switzerland, cleaning and
decontamination of the heater-cooler units was followed by recontamination. A new heater-
cooler unit that initially tested negative for *M. Chimaera* at the hospital tested positive three
months after purchase and installation.")

25.     The risk of NTM transmission with the 3T is not unique in Kansas hospitals, including The University of Kansas Hospital, Kansas City, Kansas.  In October and November 2015, two Pennsylvania hospitals notified approximately 3,600 patients of their exposure to NTM through use of the 3T.  On September 20, 2016, a third Pennsylvania hospital, Penn Presbyterian Medical Center in Philadelphia, announced patient infections linked to the 3T.

26.     To date, there have been at least 21 confirmed NTM infections in Pennsylvania which have resulted in five deaths.

27.     Hospitals in at least 14 other U.S. states have reported patient infections and/or device contamination with NTM.  For example, in May 2016, Swedish Medical Center in Seattle, Washington, issued letters notifying certain cardiac bypass patients that it had tested and found NTM in several of its 3Ts.

28.     On October 21, 2015, following the first NTM outbreak in Pennsylvania, the U.S. Centers for Disease Control and Prevention ("CDC") issued an Interim Practical Guidance communication to raise awareness among health departments, healthcare facilities and providers of the association between NTM infections and the use of heater-cooler devices.

29.     On December 29, 2015, the FDA sent Defendants a warning letter advising that 3Ts were subject to refusal of admission into the U.S. until they resolved several FDA violations, including the FDA's determination that the 3Ts were adulterated[8] and misbranded and lacked requisite safety validation for several design changes to both the device itself as well as a series

---

[8]Under the Federal Food, Drug and Cosmetic Act, a medical device is "adulterated" if the methods used in, or the facilities or controls used for their manufacture, packing, storage or installation are not in conformity with current good manufacturing practice requirements of the Quality System regulation.

of revised disinfection instructions.  The FDA's findings were based on its inspections of the

company's Munchen, Germany, and Arvada, Colorado production facilities.

30.     In the letter, the FDA identified various design change orders dating back to

December 11, 2012, which had never been documented, validated and/or submitted to the FDA

for approval.

31.     The letter also identified several changes to the disinfection instructions, dating

back to December 20, 2011, which had never been reported to the FDA and which, like the

current disinfection instructions, lacked proper efficacy validation.

32.     In April 2016, a Euro Surveillance study following environmental investigations

conducted between July 2014 and June 2015 determined that certain 3Ts manufactured at

Defendants' Munich, Germany production facility were contaminated with NTM on the

production line or elsewhere at Defendants' manufacturing facility.

33.     A June 1, 2016, FDA Safety Communication following the Euro Surveillance

findings noted that "this paper suggests a direct link between the *M. Chimaera* to which

European patients were exposed and became infected during open-chest cardiac surgery, and one

specific heater-cooler model–the 3T."  The FDA cautioned U.S. purchasers of the 3T that if they

purchased their units before September 2014, they may have been shipped from Defendants'

factory contaminated with *M. Chimaera*.[9]

34.     In June 2016, a study published in the Journal of Emerging Infectious Diseases

confirmed the airborne transmission of NTM via 3Ts due to the ability of the 3T's exhaust fan to

_____

[9]June 1, 2016, FDA Safety Communication, available at http://wayback.archive-it.org/7993/20171115052212/https://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm504213.htm (last accessed April 2, 2018) (archived and updated October 13, 2016).

disrupt the ultraclean air ventilation systems of operating rooms.  According to the study,

aerosolization from the 3T carried *M. Chimaera* particles a distance of up to five meters from the

device.

35.     On June 2-3, 2016, the FDA hosted a Circulatory System Devices Panel for the

Medical Devices Advisory Committee to address the public health risk posed by heater-cooler

devices, and in particular, the 3T.

36.     During this Panel, the FDA noted that nearly 90% of the Medical Device Reports

("MDR") it received between January 2010 and February 2016 citing device contamination and

patient infection were attributed to the 3T.

37.     During this Panel, Defendants' representatives admitted that the company was in

the process of retrofitting existing 3Ts with new design features, including, but not limited to,

changing tubing materials from PVC to polyethylene to limit biofilm formation and the

introduction of plugs in the water circuit to prevent sitting water.

38.     On October 13, 2016, the CDC released the results of genome sequencing studies,

confirming that patient infections in Pennsylvania and Iowa were directly linked to Defendants'

Munich, Germany, manufacturing site.[10]

---

[10]*See* CDC Morbidity and Mortality Weekly Report for October 14, 2016, available
online at https://www.cdc.gov/mmwr/volumes/65/wr/mm6540a6.htm?s_cid=mm6540a6_w (last
accessed April 3, 2018).  Multiple studies have since linked the same strain of *M. Chimaera* to
patient infections following use of the 3T in geographically sequestered locations such as
Australia, Canada, France, Germany, Hong Kong, Ireland, the Netherlands, Spain and
Switzerland.  *See e.g.*, Svensson, *et al., Mycobacterium chimaera* in heater-cooler units in
Denmark related to isolates from the United States and United Kingdom, Emerg Infect Dis.,
March 2017, available online at https://www.nc.cdc.gov/eid/article/23/3/16-1941_article (last
accessed April 3, 2018); *see also* Walker, *et al.*, Microbiological Problems and Biofilms
Associated with *Mycobacterium Chimaera* in Heater-Cooler Units Used for Cardiopulmonary
Bypass, Journal of Hospital Infection, April 26, 2017 (collecting data of global *M. Chimaera*

39.     That same day, the FDA issued an updated Safety Communication instructing hospitals throughout the country to consider transitioning away from 3Ts manufactured before September 2014 due to evidence of "point source contamination at the production site".[11]

40.     Subsequent studies published in 2017 further confirm "an ongoing international outbreak of *M. Chimaera* infection following cardiac surgery" and that "all *M. Chimaera* infections have been attributed to a specific make/model of HCU (Sorin 3T, LivaNova PLC, formerly Sorin Group Deutschland GmbH)".[12]

**FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF KRISTINE HAMILTON**

41.     In the spring of 2017,  Kristine Hamilton, then 52 years of age, experienced flu like symptoms, including a fever.  Blood cultures were positive for streptococcus sanguinis.

42.     Plaintiff Hamilton was admitted to Via Christi Medical Center in Wichita, Kansas, where she was diagnosed with aortic valve endocarditis.  On April 14, 2017, Plaintiff Kristine Hamilton was transferred to Kansas University Hospital in Kansas City, Kansas, where on April 18, 2017, she underwent complex open heart surgery and placement of a permanent pacemaker.  Jeffrey Kramer, MD was the lead cardiothoracic surgeon.  Bypass time was 212

_____

infections).

[11]*See* October 13, 2016 "UPDATE: Mycobacterium Chimaera Infections Associated with LivaNova PLC (formerly Sorin Group Deutschland GmbH) Stockert 3T Heater-Cooler System: FDA Safety Communication", available online at http://www.fda.gov/MedicalDevices/Safety/AlertsandNotices/ucm520191.htm (last accessed April 3, 2018).

[12]*See e.g.*, Walker, *et al., supra*; Lyman, *et al., supra* (detailing a Pennsylvania field investigation which "confirmed a prolonged outbreak of invasive MAC infections associated with cardiac surgery requiring cardiopulmonary bypass with exposure to 3T HCDs, similar to reports from Europe.")

minutes.  Anesthesia started at 08:02 and stopped at 17:20.  A Sorin 3T Heater-Cooler System was used during this surgery.

43.     Post-operatively, Kristine Hamilton initially  did well;  was discharged on April 28, 2017; but then had abnormal echocardiogram, prompting her being re-admitted to Kansas University Hospital in early June of  2017.

44.     On June 8, 2017, Kristine Hamilton underwent a reoperative sternotomy, a redo aortic root replacement and coronary artery bypass. *Mycobacterium chimaera* was cultured from her valve leaflets.

45.     Plaintiff Kristine Hamilton has undergone extensive antibiotic therapies to treat the mycobacterium infection and has endured continued pain, suffering and a chronic disease state.

46.     Plaintiff Kristine Hamilton's care and treatment is coordinated among her physicians in Wichita, Kansas, those at Kansas University Hospital and National Jewish Health in Denver, Colorado.

47.     In addition to active treatment, Kristine Hamilton has been and continues to be monitored for dissemination of the disease and complications, such as hearing impairment and optic neuritis, iatrogenic sequelae of the needed therapies.

48.     As a direct and proximate result of Defendants' negligence and liability producing conduct as described herein, Kristine Hamilton acquired an *M. Chimaera* infection, forcing her to undergo painful medical procedures and treatment, including but not limited to an additional open heart surgery,  antibiotic therapy, routine echocardiograms and additional testing.

49.     As a direct and proximate result of Defendants' negligence and liability producing

conduct as described herein, Plaintiff Kristine Hamilton expended various sums of money for medical care and treatment and ancillary travel costs.

50.     As a direct and proximate result of Defendants' negligence and liability producing conduct as described herein, Plaintiff Kristine Hamilton suffered and continues to suffer from excruciating and agonizing physical and emotional pain.

51.     Plaintiff Kristine Hamilton was in no way responsible for her injuries.

## COUNT I
## Negligence-Design Defect

52.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

53.     The 3T is a product within the meaning of Kansas products liability law.

54.     The 3T was expected to reach, and did reach, users and/or consumers, including Plaintiff Kristine Hamilton without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

55.     Under Kansas products liability law, Defendants Sorin and Sorin USA owed Plaintiff a duty to exercise reasonable care in designing and testing the 3T.

56.     Defendants, Sorin and Sorin USA, designed the 3T for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

57.     At all times material, the 3T was used in a manner intended and/or foreseeable to the Defendants.

58.     A patient or consumer using the 3T would reasonably expect the device to be free of significant defects.

59.     The 3T, as designed by Defendants, colonizes bacteria, including *M. Chimaera*.

60.     The 3T, as designed by the Defendants, directly transmits bacteria, including *M. Chimaera*, to patients during invasive surgery.

61.     The foreseeable risks of using the 3T, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T.

62.     Reasonable alternative designs existed for the 3T which would have eliminated or reduced the risk of bacterial colonization and/or transmission of such bacteria to patients undergoing invasive surgical procedures.

63.     Reasonable and feasible alternative designs include, but are not limited to, measures to direct airflow away from the surgical filed (*i.e.*, a housing unit for the exhaust vent), reducing the force at which air is vented from the System to a rate of less than 1,000 cubic feet per minute, water reservoir isolation by using closed loop fluid management, an open water design to prevent inaccessible airspace, removable lids and parts for easy disinfection, disposable tank liners to prevent biofilm formation, and internal pasteurization or UV features to kill bacteria.

64.     The failure to use feasible, reasonable alternative designs that eliminate bacterial colonization and the aerosolization of bacteria into the ambient air of operating rooms renders the 3T unreasonably unsafe.

65.     Defendants knew or should have known that NTM, or other harmful bacteria, could colonize within the 3T and be spread to patients during surgery through the exhaust vent.

66.     Plaintiff Kristine Hamilton's *M. Chimaera* infection was caused by Defendants' conduct as follows:

     a)     Failing to conduct adequate safety and efficacy testing before placing the 3T into the stream of commerce;

     b)     Failing to timely establish procedures for reviewing the design of the 3T after receiving information that patients were developing the bacterial infections as a result of surgeries using the 3T;

     c)     Failing to timely establish procedures for validation or, where appropriate, review and approval of design change orders for the 3T before their implementation as required under 21 CFR 820.30(i); and

     d)     Failing to design or redesign the 3T to eliminate or mitigate bacterial colonization and/or transmission of such bacteria.

67.     Plaintiff Kristine Hamilton was proximately harmed by the design defects in the 3T as described above.

WHEREFORE, Plaintiff Kristine Hamilton demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Kansas, together with interest thereon, costs of suit and attorneys' fees.

## COUNT II
### Strict Liability-Manufacturing Defect

68.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

69.     The 3T is a product within the meaning of Kansas products liability law.

70.     The 3T was expected to reach, and did reach, users and/or consumers, including

14

Plaintiff Kristine Hamilton without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

71.     Defendants Sorin and Sorin USA manufactured the 3T for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

72.     At all times material, the 3T was used in a manner intended and/or foreseeable to the Defendants.

73.     A reasonable patient or consumer of the 3T would expect that the device be free of significant defects.

74.     The 3T, as manufactured by the Defendants, colonizes bacteria, including *M. Chimaera*.

75.     The 3T, as manufactured by the Defendants, directly transmits bacteria, including *M. Chimaera*, to patients during invasive surgery.

76.     The foreseeable risks of using the 3T, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T.

77.     Plaintiff Kristine Hamilton's *M. Chimaera* infection was caused by Defendants' conduct as follows:

      a)     Failing to timely establish procedures or practices to prevent the 3T from being contaminated with NTM on the production line or elsewhere at Defendants' production facilities;

      b)     Manufacturing and selling the 3T with NTM contamination that occurred on the production line or elsewhere at Defendants' production facilities; and

15

      c)     Failing to ensure proper workmanship, materials and labeling for the 3T.

78.     Plaintiff Kristine Hamilton was proximately harmed by the manufacturing defects in the 3T as described above.

WHEREFORE, Plaintiff Kristine Hamilton demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Kansas, together with interest thereon, costs of suit and attorneys' fees.

### COUNT III
### Negligence-Warning Defects

79.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

80.     The 3T is a product within the meaning of Kansas products liability law.

81.     The 3T was expected to reach, and did reach, users and/or consumers, including Plaintiff Kristine Hamilton without substantial change in the defective and unreasonably dangerous condition in which it was sold or distributed.

82.     Defendants Sorin and Sorin USA owed Plaintiff Kristine Hamilton a duty to exercise reasonable care in marketing, advertising, promoting, distributing and/or selling the 3T.

83.     Defendants Sorin and Sorin USA marketed, advertised and promoted the 3T for the purpose of heating and cooling patient blood during major heart, lung and liver surgeries.

84.     At all times material, the 3T was used in a manner intended and/or foreseeable to the Defendants.

85.     A reasonable patient or consumer of the 3T would expect that the device be free

of significant defects.

86.     The 3T colonizes bacteria, including *M. Chimaera*, and directly transmits such bacteria to patients during invasive surgery.

87.     Defendants knew or should have known that NTM, or other harmful bacteria, could colonize within the 3T and be spread to patients during surgery through the exhaust vent.

88.     The foreseeable risks of using the 3T, particularly severe bacterial infection and/or death, significantly outweigh the benefits conferred upon patients using the 3T.

89.     Plaintiff Kristine Hamilton's *M. Chimaera* infection was caused by Defendants' conduct as follows:

        a)     Failing to provide proper cleaning and disinfection procedures for
               the 3T;

        b)     Failing to conduct proper validation studies to demonstrate the safety
               and efficacy of cleaning and disinfection procedures for the 3T;

        c)     Failing to warn patients like Kristine Hamilton and/or purchasers of
               the 3T that the device colonized bacteria and unnecessarily transmitted
               it into the ambient air of operating rooms; and

        d)     Failing to timely notify known purchasers of the 3T that patients could
               be exposed to NTM.

90.     Plaintiff Kristine Hamilton was proximately harmed by the warnings defects in the 3T as described above.

        WHEREFORE, Plaintiff Kristine Hamilton demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be

17

permitted pursuant to the laws of the State of Kansas, together with interest thereon, costs of suit and attorneys' fees.

## COUNT IV
### Loss of Spousal Consortium

91.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

92.     Plaintiff Kristine Hamilton and Rohn Hamilton are husband and wife.  As a result of the aforesaid injuries sustained by Kristine Hamilton, Rohn Hamilton has been and will continue to be deprived of the care, companionship, services and consortium of his wife.

93.        Pursuant to K.S.A. 23-2605, these losses vest in Plaintiff Kristine Hamilton for the benefit of Rohn Hamilton.

WHEREFORE, Plaintiff Kristine Hamilton demands judgment against Defendants, individually, jointly, vicariously, severally, and/or in the alternative, for such damages as may be permitted pursuant to the laws of the State of Kansas, together with interest thereon, costs of suit and attorneys' fees.

## PRAYER FOR RELIEF

Plaintiff Kristine Hamilton requests the Court to enter judgment against the Defendants as follows:

A.     An award to Plaintiff of compensatory and punitive damages, costs and reasonable attorneys' fees, as permitted by law;

B.     An award of post-judgment interest, as provided by law;

C.      Leave to amend this Complaint to conform to the evidence produced at

trial; and

D.      For such other relief as may be appropriate under the circumstances.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 4, 2018

Respectfully submitted,

HUTTON & HUTTON LAW FIRM, L.L.C.
/s/ Andrew W. Hutton
Andrew W. Hutton, KS Bar No. 10264
Blake A. Shuart, KS Bar No. 24463
Anne M. Hull, KS Bar No. 14436
P. O. Box 638
Wichita, KS 67201-0638
Email:  andrew.hutton@huttonlaw.com
        blake.shuart@huttonlaw.com
        anne.hull@huttonlaw.com
Tel:    316-688-1166
Fax:    316-686-1077
        *Attorneys for Plaintiff*